[Cite as *State ex rel. Ohio Paperboard v. Indus. Comm.*, 2016-Ohio-7005.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Ohio Paperboard, | : | |
| Relator, | : | |
| v. | : | No. 15AP-871 |
| Industrial Commission of Ohio and John S. Ruckman, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

D E C I S I O N

Rendered on September 27, 2016

**On brief:** *ICE MILLER LLP,* and *Corey V. Crognale,* for relator. **Argued:** *Corey V. Crognale.*

**On brief:** *Michael DeWine,* Attorney General, and *John R. Smart,* for respondent Industrial Commission of Ohio. **Argued:** *John R. Smart.*

**On brief:** *Larrimer & Larrimer,* and *Thomas L. Reitz,* for respondent John S. Ruckman. **Argued:** *Thomas L. Reitz.*

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

LUPER SCHUSTER, J.

{¶ 1} Relator, Ohio Paperboard, initiated this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order granting John S. Ruckman an additional award based on violations of specific safety requirements ("VSSR") and ordering the commission to deny Ruckman's VSSR award application in its entirety.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued the appended decision, which includes findings of fact and conclusions of law. The magistrate concluded that the commission did not abuse its discretion in finding violations of specific safety requirements set forth in Ohio Adm.Code 4123:1-5-05(C)(2), (C)(4), and (D)(1) and granting Ruckman a VSSR award of 40 percent of the maximum weekly rate. Thus, the magistrate recommends this court deny Ohio Paperboard's request for a writ of mandamus.

{¶ 3} Ohio Paperboard has filed objections to the magistrate's decision. Therefore, we must independently review the decision to ascertain whether "the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d). Ohio Paperboard presents five objections. First, it argues the magistrate "erroneously concluded that Ruckman was exposed to an unguarded pinch point while performing his maintenance duties." (Relator's Objs. at 3.) According to Ohio Paperboard, Ruckman's own conduct caused him to be exposed to the pinch point hazard. Second, it argues the magistrate erroneously concluded that there was no evidence that Ruckman violated a safety rule when he attempted to remove cut bailing wire from Ohio Paperboard's machine. Ohio Paperboard asserts that Ruckman's violation of company safety policies caused his injury. Ohio Paperboard's third and fourth objections allege that the magistrate misinterpreted the evidence concerning the issue of whether Ruckman, as a maintenance mechanic, was an "operator" of the machine for the purpose of the specific safety requirements. Finally, it argues in its fifth objection that the magistrate erred in not concluding that Ruckman's unilateral actions violating safety protocol were the direct and proximate cause of the accident and his injury.

{¶ 4} For ease of discussion, we first address Ohio Paperboard's third and fourth objections. In these objections, Ohio Paperboard challenges the magistrate's conclusion regarding Ruckman's status as an "operator." The magistrate found that there is some evidence in the record from which the commission could conclude that Ruckman was an operator at the time he was injured. We agree.

{¶ 5} Ohio Paperboard employed Ruckman as a maintenance worker. Ruckman performed preventative maintenance on Ohio Paperboard's bale conveyor, which

transports 900-pound bales of cardboard and paper secured together by baling wire into the facility for processing. Approximately once per week, normal operation of the conveyer belt is halted and it is placed in "maintenance mode," and Ruckman and other mechanics perform preventative maintenance on the conveyer by oiling the machine and removing cut baling wires that could cause damage. (Mar. 19, 2015 Tr. at 71.) To perform the preventative maintenance, a protective guard is removed, exposing gears, chains, and sprockets. Ruckman was injured when he attempted to extract a cut baling wire from a gear after powering the machine, and the machine caught his glove and pulled his hand into the machine.

{¶ 6} According to Ohio Paperboard, Ruckman was not the operator of the bale conveyer at the time of his accident. As to this issue, Ohio Paperboard correctly notes that the commission and the magistrate misquoted Ohio Adm.Code 4123:1-5-01(B)(92) as defining "operator" as "any employee assigned or authorized to work *on* the specific equipment." Instead, that code section defines "operator" as "any employee assigned or authorized to work *at* the specific equipment." (Emphasis added.) However, Ohio Paperboard concedes that Ruckman performed maintenance and repair work "on" the bale conveyor, and it does not explain why the inadvertent substitution of "on" for "at" is significant here. We find the clerical error to be inconsequential because a mechanic working *on* a machine is also working *at* the machine. In addition, Ohio Paperboard essentially contends that Ruckman was not an operator of the bale conveyor because he did not operate it during normal operation. But as the magistrate noted, this argument does not account for the evidence that maintenance mechanics operated the bale conveyor when it was in "maintenance mode." As a maintenance mechanic, Ruckman was able to start and stop the bale conveyor using the emergency stop buttons for the purpose of running the conveyor to identify repair or maintenance issues. Therefore, we agree with the magistrate's finding that some evidence in the record demonstrates that Ruckman, as a maintenance mechanic, was an operator at the time he was injured. Accordingly, Ohio Paperboard's third and fourth objections lack merit and are overruled.

{¶ 7} Ohio Paperboard's first objection challenges the applicability of Ohio Adm.Code 4123:1-5-05(C)(2), (C)(4), and (D)(1). In support of this challenge, Ohio Paperboard argues that Ruckman's exposure to the machine and the pinch point resulted

from Ruckman's own misconduct. Similarly, in its second and fifth objections, Ohio Paperboard argues that it should not be held responsible for Ruckman's failure to comply with company safety policies. Ohio Paperboard also contends that the Supreme Court of Ohio's decision in *State ex rel. Ford v. Indus. Comm.*, 67 Ohio St.3d 121 (1993) required the commission to find the safety requirements of Ohio Adm.Code 4123:1-5-05(C)(2), (C)(4), and (D)(1) to be inapplicable. Ohio Paperboard argues that the magistrate erred in distinguishing *Ford* from this case. These objections are unpersuasive.

{¶ 8} The magistrate reasoned that, viewing Ruckman as an operator, the commission's finding that Ohio Paperboard violated Ohio Adm.Code 4123:1-5-05(C)(2), (C)(4), and (D)(1) are straightforward under the facts. The magistrate also rejected Ohio Paperboard's argument that *Ford* requires this court to conclude that the commission abused its discretion in finding safety violations. We agree.

{¶ 9} Ohio Adm.Code 4123:1-5-05(C)(2) states: "All conveyors, where exposed to contact, shall be equipped with means to disengage them from their power supply at such points of contact." "Exposed to contact" is defined as "the location of the material or object which, during the course of operation, is accessible to an employee in performance of the employee's regular or assigned duty." Ohio Adm.Code 4123:1-05-1(B)(47). Ohio Adm.Code 4123:1-5-05(C)(4) states: "Pinch points created by travel of conveyor belts over or around end, drive and snubber, or take-up pulleys of chain conveyors running over sprocket wheels shall be guarded or a means shall be provided at the pinch point to disengage the belt or chain from the source of power." Finally, Ohio Adm.Code 4123:1-5-05(D)(1) states: "Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply. This shall not apply to rolling departments of iron and steel mills nor to electrical power generation or conversion equipment."

{¶ 10} As an operator of the bale conveyer, Ruckman was exposed to a pinch point hazard when he performed preventative maintenance. Before the commission, Ruckman initially alleged a violation of Ohio Adm.Code 4123:1-5-05(D)(2), which requires that when machines are "shut down for repair, adjusting, or cleaning," the controls must be either locked in the off position or warning tags indicating that the machine is shut down must be placed on the machine. *State ex rel. Lange v. Indus. Comm.*, 10th Dist. No.

04AP-1330, 2005-Ohio-5487, ¶ 22. "This is commonly known as the 'lock out / tag out procedure.' " *Id.* Ruckman abandoned his allegation that Ohio Paperboard violated Ohio Adm.Code 4123:1-5-05(D)(2) because the evidence before the commission demonstrated Ohio Paperboard was in compliance with that requirement. However, Ohio Paperboard argues it did not violate Ohio Adm.Code 4123:1-5-05(C)(2), (C)(4), or (D)(1) because Ruckman was not at risk of exposure to contact or any pinch point hazard because company policy mandated that the bale conveyer's power supply be securely disconnected using the company's "lock out / tag out" safety procedures during maintenance and repairs. Ohio Paperboard essentially argues that its compliance with Ohio Adm.Code 4123:1-5-05(D)(2) demonstrates that Ruckman caused his injury by unilaterally violating work procedures and protocol by removing the guard covering the pinch point and powering the bale conveyer to try to extract the wire. These arguments are unpersuasive.

{¶ 11} Ohio Paperboard's arguments assume that repair work only occurred on the bale conveyer when the barrier guard was attached. But evidence demonstrated that removing the barrier guard was a necessary part of the maintenance procedures because it enabled the mechanic to locate and remove cut baling wire in the machine and to identify other potential issues. Furthermore, that Ruckman reached toward the pinch point to try to remove a wire while the machine was operating did not relieve Ohio Paperboard of its obligations under Ohio Adm.Code 4123:1-5-05(C)(2), (C)(4), and (D)(1). Generally, negligence or absent-mindedness of the employee will not bar recovery for a VSSR. *State ex rel. Cotterman v. St. Mary's Foundry*, 46 Ohio St.3d 42, 47 (1989). In fact, specific safety requirements are intended to protect employees against their own negligence and folly as well as provide them a safe place to work. *Id.* The "proper focus in determining whether a VSSR award should be made remains on the employer" and the "failure of the employer to comply with a specific safety requirement forms the basis for an additional award." *Id.* An employee's conduct may be pertinent in a VSSR case, however, if the "unilateral negligence" defense applies.

{¶ 12} The "unilateral negligence" defense derives from *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.*, 37 Ohio St.3d 162 (1988), wherein an employer was exonerated from VSSR liability because an employee had removed a part of a scaffold that had been required by a specific safety requirement. This defense only applies, however,

when the employer has first complied with relevant safety requirements. *State ex rel. Hirschvogel, Inc. v. Miller*, 86 Ohio St.3d 215, 218 (1999). "If the employer did not initially comply [with the applicable specific safety requirement], the employee's conduct is inconsequential." *State ex rel. Coffman v. Indus. Comm.*, 109 Ohio St.3d 298, 2006-Ohio-2421, ¶ 13. The "the critical issue in a VSSR claim is always whether the *employer* complied with the specific safety requirement." (Emphasis sic.) *State ex rel. Quality Tower Serv., Inc. v. Indus. Comm.*, 88 Ohio St.3d 190, 193 (2000). Thus, a claimant's negligence bars a VSSR award only where the claimant deliberately renders an otherwise complying device noncompliant. *State ex rel. R.E.H. Co. v. Indus. Comm.*, 79 Ohio St.3d 352, 355 (1997).

{¶ 13} Here, it is undisputed that there were no means for Ruckman to disengage the power supply at the location of his exposure to the pinch point hazard. As the magistrate thoroughly explained, unlike in *Ford*, the hazard here was not accessible only during the cessation of operations. Ruckman was injured during the ordinary course of his operations at the machine. Therefore, the magistrate properly rejected Ohio Paperboard's arguments based on *Ford* and the unilateral negligence defense. Accordingly, Ohio Paperboard's first, second, and fifth objections are overruled.

{¶ 14} The commission, on determining that Ohio Paperboard violated the specific safety requirements, did not opine as to whether Ruckman engaged in negligent misconduct. Because we conclude that the commission did not abuse its discretion in finding that Ohio Paperboard violated Ohio Adm.Code 4123:1-5-05(C)(2), (C)(4), and (D)(1), Ruckman's actions relating to the log out / tag out procedures are inconsequential. Consequently, we, like the commission, reach no conclusion as to whether Ruckman's conduct violated company policy or procedure. Therefore, we do not adopt the magistrate's analysis regarding the propriety of Ruckman's conduct.

{¶ 15} Following our independent review of the record pursuant to Civ.R. 53, we find the magistrate correctly determined Ohio Paperboard is not entitled to the requested writ of mandamus. The magistrate properly applied the pertinent law to the salient facts. We adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein, except we do not adopt the magistrate's decision to the extent it addresses the issue of whether Ruckman violated his employer's safety rules,

and we correct the clerical error discussed above relating to the precise language of Ohio Adm.Code 4123:1-5-01(B)(92).   We therefore overrule Ohio Paperboard's objections to the magistrate's decision and deny its request for a writ of mandamus.

*Objections overruled;*
*writ of mandamus denied.*

DORRIAN, P.J., and BRUNNER, J., concur.

_____

APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio ex rel. Ohio Paperboard,          :

              Relator,          :

v.          :                    No.  15AP-871

Industrial Commission of Ohio          :                    (REGULAR CALENDAR)
and John S. Ruckman,
                      :

              Respondents.          :

                      :

M A G I S T R A T E ' S   D E C I S I O N

Rendered on March 24, 2016

*ICE MILLER LLP,* and *Corey V. Crognale,* for relator.

*Michael DeWine*, Attorney General, and *John R. Smart,* for respondent Industrial Commission of Ohio.

*Larrimer and Larrimer,* and *Thomas L. Reitz,* for respondent John S. Ruckman.

IN MANDAMUS

{¶ 16} Relator, Ohio Paperboard, has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order granting John S. Ruckman ("Ruckman") an additional award based upon a violation of a specific safety requirement ("VSSR"), and ordering the commission to deny Ruckman's application in its entirety.

Findings of Fact:

{¶ 17} 1. Relator operates a paper mill that recovers and recycles waste paper, cardboard, magazines, and books to make recycled paperboard used in several applications, including carton packaging, rigid boxes, tubes, and furniture board. (See Relator's Brief, 3.)

{¶ 18} 2. Ruckman began his employment with relator in 1996 and was employed as a maintenance worker at the time his injury occurred.

{¶ 19} 3. On the day of his injury (February 27, 2012), relator was performing preventative maintenance on the bale conveyor. Testimony from the hearing before the staff hearing officer ("SHO") explains the operation of the bale conveyor as follows: recycled cardboard and paper products are compacted, bailed, and transported to relator. The wired bails, weighing approximately 900 pounds each, are loaded onto the bale conveyor, and conveyed from the scrap yard into the beater room of the mill. A bale saw positioned overhead cuts the bailing wire as the bails are moved into the pulper for processing. The bale conveyor runs 24 hours a day except when it is shut down for preventative maintenance. Specifically, the bale conveyor is shut down every Monday to allow the maintenance mechanics to maintain and repair the equipment. Part of this maintenance involves removing pieces of wire which have fallen onto the conveyor and wrapped around the conveyor shaft and gears. If these wires are not removed, the conveyor will be damaged. As a maintenance mechanic, Ruckman performed this weekly preventative maintenance approximately 350 times from September 2004 through the date of his accident in 2012. (Tr. 190-93, 201-07.)

{¶ 20} 4. After describing the bale conveyor and identifying photographs of the bale conveyor, Ruckman explained that, in order to perform the preventative maintenance, he had to remove a guard which, during the regular course of business, protects employees from coming into contact with the gears. Ruckman explained that he was working with Mark Horvath that day and he described what happened that day as follows:

> Q. So after the guards had been removed you are in the process of removing the wire that is wrapped around the sprocket.

A. That's correct.

Q. What happens next? I mean, at least on the date of your injury what happened next? How did you get hurt?

A. Well, we had already de-wired everything. My co-worker was on the back side, I was on the front side and he had had all his wire off and we were going to go down and get oil to oil it, and I had two wires left, but one of the wires was underneath the gear.

Q. Okay.

HEARING OFFICER: Let me interrupt just for a second. Back side/front side, that doesn't mean a lot to me. What's "back side" and "front side" mean to you?

THE WITNESS: Okay. Where I was at is the front side of the conveyor, which is in the beater room.

HEARING OFFICER: Okay.

THE WITNESS: He was on the opposite side. There's two gears, one on the back and one on the front. If you look at photograph --

HEARING OFFICER: All right. Let me just ask you this, if I'm in photograph 8, you're standing there looking at that wall of the conveyor unit, is he on the other -- not on the other side of that specific wall, but on the other side of the conveyor?

THE WITNESS: Other side of the conveyor.

HEARING OFFICER: That's the back side as you're describing it?

THE WITNESS: Yeah. Right.

HEARING OFFICER: Thank you.

THE WITNESS: He was done with that.

HEARING OFFICER: Okay. But he was still over there.

THE WITNESS: No.

HEARING OFFICER: Where was he?

THE WITNESS: He was getting oil.

HEARING OFFICER: Okay. I think that's where you left off, so go ahead.

Q. (By Mr. Goodburn) So the other gentleman was getting oil.

A. Uh-huh, because that was our next step after we get that wire off.

Q. And you still had two wires to remove, you said.

A. Uh-huh.

Q. So what happened next?

A. Well, I couldn't get the wire out. I couldn't pull it out, I had -- and I couldn't pull out, so I unlocked the machine and turned it on and grabbed my pliers and let the machine help me pull it out.

Q. Okay.

A. It was helping me pull it out and the long piece -- hold on -- went back between the conveyor and I reached for it and something caught my hand and pulled it.

Q. Okay.

A. And I couldn't get loose. And I tried to hit the switch and I couldn't.

Q. Where did you turn the machine on? Right here where the arrow indicates?

A. Yes.

Q. Okay.

A. There are lockouts here and you pull the red button, the [emergency stop], and it takes off.

Q. And you weren't able to reach that.

A. No, I'm clear up here.

Q. And when you say, just to back up, when you say you turned the machine on so the conveyor would help you --

A. Right.

Q. -- it's turning --
A. It's turning this way.

Q. -- this way, so clockwise.

A. Yes. It's turning clockwise and the wire is stuck underneath, and if you pull it, the conveyor will help pull the wire out.

Q. Okay. Very good.

A. Some of those wires are six, eight feet long.

Q. Okay. The other gentleman that was working with you, who was that?

A. Mark Horvath.

Q. Mark Horvath.

How did the machine ultimately get stopped?

A. I screamed and hollered and -- I had a big long pair of pliers and I was trying to hit that button, I couldn't hit it, and the operator finally heard me and he come out and shut it off.

Q. Okay.

HEARING OFFICER: Let me stop again for a second. You're trying to reach this button --

THE WITNESS: This button, yes.

HEARING OFFICER: -- where you had turned it on.

THE WITNESS: Uh-huh.

HEARING OFFICER: But you were on the other side --

THE WITNESS: I had to go up here to pull the wire.

HEARING OFFICER: Right. So how far was that reach? That looks --

THE WITNESS: That's too far -- it was too far to reach. That's -- that is the [emergency stop] that we had asked them to move up here where we worked.

HEARING OFFICER: Why did you ask them to move it?

THE WITNESS: So we could turn it on and off there.

HEARING OFFICER: Why there as opposed to where it is?

THE WITNESS: So you could reach it if something were to happen.

(Tr. 14-18.)

{¶ 21} Ruckman further explained:

A. I was reaching by the back of the bearing, that's where my right hand was, and when I pulled the wire out, it flipped in between this, that dark spot between that guard and the other guard, that open spot there, and I reached with this hand, that's when something caught it and it pulled me into the gear.

Q. All right. I just wanted to be clear that that was the plate or the item we're talking about that had been removed.

A. Yes.

(Tr. 26.)

{¶ 22} 5.  During further cross-examination at the hearing, Ruckman was asked if he had ever worked as an "operator" and he responded no.  Ruckman identified John Smith as the man he believed was operating the bale conveyor that day.  When questioned further about the operation of the bale conveyor and what happens when maintenance is performed, Ruckman explained further:

Q. * * * And then in regard to the machine itself, the operator that's been discussed here, the operator's in charge of running the machine typically until Maintenance becomes

involved. At that point in time do you take operation of the machine away from the operator so you can perform your maintenance duties?

A. Yes. It is -- our boss has -- goes tells their boss, which is the tour boss, that we are going to be performing maintenance on the bale conveyor.

Q. At that point the operation of the conveyor becomes your responsibility, not the operator's.

A. That's correct.

Q. And then when you're done performing your maintenance operations, does that same supervisor then go back and tell the operator's supervisor that maintenance has been completed and --

A. No.

Q. What happens at that point?

A. We tell, myself and Mr. Horvath would tell the operator that it was theirs. We were done.

* * *

HEARING OFFICER: But in the instances where there would be a wire or two still attached, this was your common practice to turn the machine back on, go in with your pliers, and pull those one or two --

THE WITNESS: We had done that before.

HEARING OFFICER: Okay. Just for clarification purposes, "done it before" is how many times?

THE WITNESS: Oh, I'm not sure.

HEARING OFFICER: Just guess. I mean, how frequently?

THE WITNESS: Oh, 10 or 12, probably.

HEARING OFFICER: Over the course of what time? A year?

THE WITNESS: Yeah, maybe a year.

HEARING OFFICER: Ten or 12 times a year.

THE WITNESS: Yeah. But mainly it was on the back end that we did that.

HEARING OFFICER: Okay. Mr. Crognale.

MR. CROGNALE: Thank you.

(Tr. 54-56.)

{¶ 23} Immediately thereafter, on cross-examination, Ruckman stated:

Q. (By Mr. Crognale) And when you're saying that you would reach in there and grab that wire when the machine was not locked out, that would have been a violation of the safety rule, correct?

A. We don't -- we don't reach in the wire when its running. We have our pliers on the outside. Usually there's -- when we done that before, two of us was there, one was on the switch and the other one was pulling the wire; that had happened before.

Q. So what you just described isn't, just so the hearing officer understands, it's not something that happened commonly --

A. No.

Q. -- or typically.

A. No.

Q. It happened in this one instance.

A. Right. This one incident the wires was in -- going into the bearing which would cause problems with the bearing.

Q. Okay.

A. You understand? It would have got into the rollers in the bearing.

(Tr. 57.)

{¶ 24} 6. Gary Blank, the maintenance supervisor for relator, also testified. Blank confirmed that, during the performance of the preventative maintenance, the guard, which is present during the normal operations of the conveyor, had to be removed.  In response to questioning, Blank explained the operation of the conveyor during the normal course of business and during the performance of preventative maintenance as follows:

> Q. Do your Maintenance mechanics operate the bale conveyor or the pulper?
>
> A. Not when it's in normal operation, no.
>
> Q. And if you could describe for Mr. Scholl where the bale operator is located when he's operating, you know, when the conveyor is engaged in normal operations.
>
> A. There's a shack there that the beater room operator works out of. There's a DCS control system in there and they monitor that and at times -- and he's got to come out of the shack and he'll make rounds through the beater room with thickeners and so forth, make sure everything's all right there, but he operates it out of that shack.
>
> Q. And where the bale room operator is positioned while he's in front of the controls to operate the bale conveyor, does he also have in front of him an emergency shutoff button?
>
> A. There is a shutoff that can be shut off. He can shut it off right there from inside.
>
> Q. Inside the --
>
> A. Right.
>
> Q. -- shack?
>
> A. If he's in there.
>
> MR. RUCKMAN: Yeah, if he's in there.
>
> Q. Now, who does the -- it's your Maintenance mechanics who do the PM'ing --
>
> A. Correct.

Q. -- the preventive maintenance of the bale . . .

So I'd like to talk about the preventive maintenance of the bale conveyor.

A. Okay.

* * *

Q. And I guess it's my understanding, I believe he said every Monday your Maintenance mechanics would PM the bale conveyor?

A. Correct. Every Monday we tried to do that.

Q. What did that involve?

A. That involved, once the bale conveyor was run empty, you know, they would put the DCS in --

Q. And if you could say, run empty, what do you mean by that?

A. They would empty it out into the pulper as the pulper calls for it, it's controlled on consistency, and it would take usually sometimes 20 minutes to get that emptied out.

Q. So, in other words, there would be no -- emptied out, in other words, there would be no bales of paper on the --

A. Correct.

Q. -- bale conveyor.

A. Once it was empty.

Q. Once it's empty, okay. And then what would happen?

A. It would be turned over to whoever the mechanics were at that time, and at that time usually it was Mark and Steve, and they would set the timer on that which would allow it be only controlled by the Maintenance.

Q. When you say -- where would they set the timer?

A. On the DCS inside of the beater room shack.

Q. So would that setting of the timer, in other words, it's a computer of some sort?

A. Yes.

Q. And then would the Maintenance mechanic log on?

A. Yes.

Q. And do what?

A. Once he logged on, he would set it to I think it's 240 minutes.

Q. 240 minutes to complete their --

A. Complete it.

Q. Complete the maintenance work.

A. Correct.

Q. Okay. And by logging on is there certain, when the maintenance guys would log on, is there a certain mode you call it?

A. Maintenance mode.

Q. And what does that maintenance mode allow?

A. It means they operate it from outside of the shack. It would not -- they couldn't run it inside, it was outside the shack it would have to be.

Q. So, in other words --

A. They would have to do that if they were using [emergency stops] to stop it. And if they had to go inside it, they throw the disconnect and work on it.
Q. Okay. Then we better, first of all, when you talk about they would operate, in other words, once they put that machine in maintenance mode, could Mr. Smith or any other operator from the control room --

A. Not from inside it. They'd have to come outside.

Q. And when you say "operate it," in other words, that's where the Maintenance mechanics can use the [emergency stop].

A. Yes.

Q. -- to start and stop the conveyor.

A. Yes.

(Tr. 67-71.)

{¶ 25} On cross-examination, Blank testified:

Q. Mr. Blank, I'm Paul Goodburn. I'm here for Mr. Ruckman. I just have a couple questions for you.

In terms of what you described to Mr. Crognale, I just want to confirm that the operator in the shack room or booth has control of the conveyor or the bale conveyor until Maintenance takes over, correct?

A. Correct.

Q. And then at that point Maintenance has control over the conveyor, the bale conveyor.

A. During a PM from outside.

Q. Correct.

At that point you cannot control the bale conveyor from the shack or the booth, correct?

A. That's correct.

Q. Okay. Very good.

(Tr. 87.)

{¶ 26} Blank also explained the purpose of the emergency stop button:

Q. Now, is the [emergency stop] button, is that designed to prevent the pinch point or getting in contact with the pinch point or to after you're in contact to let --

A. It would be after the contact. You know, it's something you hit to shut the equipment down if something happens.

Q. But it won't prevent contact or exposure to the pinch point.

A. No, 'cause you can stick your hand in it.

Q. The lockout/tagout, though, is -- what's that program designed to accomplish?

A. To prevent somebody from getting hurt after they start working on the equipment.

Q. Okay. In other words, to prevent exposure to the --

A. Correct.

Q. -- pinch point.

(Tr. 78-79.)

{¶ 27} Blank also testified that he had never seen anyone remove wires in the manner in which Ruckman did that day. When asked by the hearing officer what should have been done instead, Blank responded:

A. With that conveyor running I've never seen anybody reach in there and try to pull a wire out.

Q. All right. Then answer this: If you -- or, let me put it this way, what would you say is the proper procedure if the wire had been cleared out as is typical every Monday and this was a Monday where you couldn't get all the wire, I'm going to presume most Mondays you probably can get all the wire but not this particular Monday, there were a couple strands wrapped around the shaft what's the correct procedure for getting those last strands from around the shaft?

A. It should have been disconnect, push the [emergency stop], stop the conveyor, throw the disconnect off, put your lock in, reach underneath and cut it out.

Q. That had already been done. Then what's the next proper procedure?

A. Once all the wire is removed --

Q. All of that, but not all of the wires could have been removed. There were a couple left.

A. Well, lock it back out, go in and remove them.

Q. What does that entail?

A. Push the [emergency stop] to stop it, throw the disconnect and put a lock on it, go back inside the conveyor and cut the wire off.

HEARING OFFICER: Okay. Thank you. Mr. Goodburn.

(Tr. 85-87.)

{¶ 28} 7. On November 26, 2013, Ruckman filed his application for an additional award for VSSR and the matter was heard before an SHO on March 19, 2015. Based on the testimony, the SHO made the following factual findings:

Based on testimony given at the hearing, the Staff Hearing Officer finds the Injured Worker was employed as a maintenance mechanic with the Employer of Record for at least 15 years prior to his industrial accident. In that capacity, the Injured Worker performed weekly preventive maintenance on the bale conveyor.

The Employer is a one hundred percent recycled paper mill, which includes recycled cardboard, newspaper, etc. The cardboard is in wired bales, weighing approximately 900 pounds. The bales are loaded by a forklift onto a bale conveyor. The bundle then proceeds to a bale saw that cuts the wire around the bale. The bundle then drops into a pulper, goes through a cleaning process, and ultimately is recycled as paper products.

Most of the wires cut from around the bales go into the pulper but some get wrapped around the shafts and the gears of the conveyor. The maintenance employees perform preventive maintenance every Monday to remove those wires. The conveyor runs twenty-four hours a day, seven days a week except when maintenance is being performed. The Injured Worker was performing maintenance at the time he was injured.

In order to perform the preventive maintenance, the conveyor would need to be emptied out into the pulper, which would usually take about 20 minutes. After the bale conveyor was empty, control of the machine would be turned over to the mechanics, who would set a timer that would allow the conveyor to be controlled only by Maintenance. The timer was set inside the beater room control shack. Once the operation of the machines was placed in maintenance mode, the machine could only be operated from outside the control shack. This resulted in the means to start, stop, and lock-out the machine was solely in the hands of the maintenance team.

At that point in time that maintenance was to be performed at the front of the machine, the front being the part of the machine inside the building and the area where the Injured Worker sustained his injury, a protective plate, seen in evidence photograph #7, had to be removed to enable the maintenance worker's access to the chains and sprockets located in that area.

According to the Injured Worker's testimony, on the day of the injury, he and a co-worker had taken control of the machine and had followed lock-out/tag-out procedures and shut down the machine. The Injured Worker and his co-worker had removed the wires from the back and front of the machine except for two wires that were under the front gear. The co-worker left to get oil, while the Injured Worker unlocked and activated the machine in an attempt to remove the remaining two wires. It was the intent of the Injured Worker to grab a piece of wire with his pliers and pull the wire in the direction the conveyor was moving so the conveyor would help pull the wire out. Instead, something caught the Injured Worker's hand and pulled him into the machine.

The Injured Worker further testified that he tried to reach the emergency stop button to shut down the machine but the button was too far away. He attempted to reach it using his pliers, but the stop button was still not in reach. The machine was ultimately stopped by a co-worker who heard the Injured Worker screaming for assistance.

{¶ 29} The SHO identified the relevant definitions, stating:

Preliminarily, the Staff Hearing Officer finds the injury took place in a factory or workshop; therefore, the code sections cited are appropriate under Chapter 5 of the VSSR safety codes. Relevant definitions under 4123:1-5-01(B) include:

(70) "Guarded": means that the object is covered, fenced, railed, enclosed, or otherwise shielded from accidental contact;

(92) "Operator": any employee assigned or authorized to work on the specific equipment;

(94) "Pinch, nip, or shear point": the point or points at which it is possible to be caught between the moving parts of a machine, or between the material and the moving part or parts of a machine; and

(124) "Shall": to be construed as mandatory;

The Staff Hearing Officer finds the Injured Worker was an operator as defined in paragraph (92). It is undisputed that the Injured Worker was assigned or authorized to work on the conveyor in his capacity as a maintenance worker. Further, the Staff Hearing Officer finds that the Injured Worker was exposed, and his injury occurred, at a pinch point as defined in paragraph (94).

{¶ 30} In finding violations of three separate specific safety requirements, the SHO order provides:

### Ohio Adm.Code 4123:1-5-05(c)(2)

4123:1-5-05(c)(2) Conveyors exposed to contact, states: "All conveyors, where exposed to contact, shall be equipped with means to disengage them from their power supply at such points of contact." The Staff Hearing Officer finds a violation of this section. The Injured Worker was a machine maintenance worker who performed routine preventative maintenance on the machine every Monday. That maintenance was performed at essentially the same location and involved the same duties every week. Included in his maintenance duties was the removal of bailing wire from the shafts and gears of the machine. Referring to photograph #7 of the Bureau of Workers' Compensation's investigative evidence, the panel over the drive shaft sprocket had to be removed in order to remove the bailing wire. Photograph #8

shows where the panel is located, where the closest emergency stop button is located, and where the Injured Worker stood to perform his weekly maintenance. As seen in the photograph, and as testified to by the Injured Worker, the emergency stop button is not within reach of the area where the Injured Worker was working. In order to perform his maintenance duties, the Injured Worker would become exposed to contact by the removal of the guard plate and exposure of the drive shaft and gears. In such a situation, the code requires that the conveyor shall (mandatory) be equipped with means to disengage them from their power supply at such points of contact. (emphasis added.) Consequently, when the Injured Worker removed the panel and exposed the conveyor to contact, the means to disengage the power supply had to be located at the opening created by the removed panel and at the exposed shafts and gears. The means to disengage the power supply was not located at such point of contact. Therefore, the Staff Hearing Officer finds a violation of this section.

## Ohio Adm.Code 4123:1-5-05(c)(4)

4123:1-5-05(c)(4) Pinch (nip) points, states: "Pinch points created by travel of conveyor belts over and around end, drive and snubber, or take-up pulleys of chain conveyors running over sprocket wheels shall be guarded or a means shall be provided at the pinch point to disengage the belt or chain from the power source." This section provides the Employer with an option to guard the pinch point or a means to at the pinch point to disengage the belt or chain from the power source. Factually, there was a guard at the pinch point, except during preventive maintenance. The guard had to be removed for the preventive maintenance to be performed. Consequently, as the guard option could not be implemented by the Employer during preventive maintenance, the only remaining option was to provide a means at the pinch point to disengage the belt or chain from the power source. As the pinch point is essentially at the same location as the point of contact in the previously discussed code section, the Staff Hearing Officer again finds a violation as the Employer did not provide a means at the pinch point to disengage the belt or chain from the power source.

## Ohio Adm.Code 4123:1-5-05(D)(1)

The last section cited 4123:1-5-05(D)(1) Disengaging from power supply, states: "Means shall be provided at each machine, within easy reach of the operator, for disengaging it from its power supply. This shall not apply to rolling departments of iron and steel mills nor to electrical power generation or conversion equipment." The Staff Hearing Officer finds this is not a rolling department of iron or steel mills nor electrical power generation or conversion equipment; therefore, the requirement to provide a means, within easy reach of the operator, for disengaging it from its power source is applicable. The code states the means "shall" be provided, which makes the requirement mandatory. As previously found, the Injured Worker was an operator based on the definition set forth in 4123:1-05-01(B)(92). The Staff Hearing Officer also finds a violation of this code section. Referring again to photograph #8, the emergency shutoff button was not within easy reach of the operator for disengaging it from its power source, noting again the distance from where the maintenance work was regularly performed and the shutoff button was located.

The Staff Hearing Officer finds the Employer violated the three code sections cited as described and that the violations were the proximate cause of the Injured Worker's injury.

(Emphasis sic.)

{¶ 31} Thereafter, the SHO addressed relator's argument that it had complied with the specific safety requirements and rejected it, stating:

The Employer asserts that the Injured Worker had been provided with lock-out devices and the Injured Worker had failed his obligation to use the safety devices provided. The Employer contends there was unilateral negligence/misconduct on the part of the Injured Worker. The Court held in State ex rel. Quality Tower Serv., Inc. v. Indus. Comm. (2000), 88 Ohio St.3d 190, 724 N.E.2d 778, that "the critical issue in a VSSR claim is always whether the Employer complied with the specific safety requirement." "Unilateral negligence sufficient to avoid VSSR liability can exist only if there is evidence that the Employer initially satisfied the specific safety requirement and the claimant disabled or otherwise circumvented the safety apparatus." State ex rel. Danstar Builders, Inc. v. Indus. Comm. 108 Ohio

> St.3d 315, 2006-Ohio-1060, citing to <u>State ex rel. Frank
> Brown & Sons, Inc. v. Indus. Comm.</u> (1988), 37 Ohio St.3d
> 162, 524 N.E.2d 482. In this instance, the Staff Hearing
> Officer finds the Employer violated all three code sections
> cited and the Injured Worker's injuries were the proximate
> result of those violations. The first requirement cited in
> <u>Danstar</u> is not met and VSSR liability cannot be avoided.
>
> It is therefore ordered that an additional award of
> compensation be granted to the Injured Worker in the
> amount of 40 percent of the maximum weekly rate under the
> rule of <u>State ex rel. Engle v. Indus. Comm.</u> (1944), 142 Ohio
> St. 425.

(Emphasis sic.)

{¶ 32} 9. Thereafter, relator filed the instant mandamus action in this court.

<u>Conclusions of Law</u>:

{¶ 33} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 34} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 35} In regard to an application for an additional award for a VSSR, the claimant must establish that an applicable and specific safety requirement exists, which was in effect at the time of the injury, that the employer failed to comply with the requirement, and the failure to comply was the cause of the injury in question. *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257 (1972). The interpretation of a specific safety requirement is within the final jurisdiction of the commission. *State ex rel. Berry v. Indus. Comm.*, 4 Ohio St.3d 193 (1983). Because a VSSR award is a penalty, however, it must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer. *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170 (1989). The question of whether an injury was caused by an employer's failure to satisfy a specific safety requirement is a question of fact to be decided by the commission subject only to the abuse of discretion tests. *Trydle*; *State ex rel. A-F Industries v. Indus. Comm.*, 26 Ohio St.3d 136 (1986); and *State ex rel. Ish v. Indus. Comm.*, 19 Ohio St.3d 28 (1985).

{¶ 36} In arguing that the commission abused its discretion by finding that relator violated any specific safety requirements, relator makes the following arguments: (1) as a maintenance mechanic and not an operator, Ruckman was never exposed to any pinch points, (2) relator properly guarded all the pinch points and it was Ruckman's unilateral negligence of failing to properly lock-out the conveyor that caused his injuries, and (3) even if any violations occurred, a 40 percent penalty is excessive.

{¶ 37} For the reasons that follow, this magistrate rejects relator's arguments.

{¶ 38} The main focus of relator's argument centers on its contention that Ruckman was not an operator of the bale conveyor and it was an abuse of discretion for the SHO to find otherwise. At the outset of the discussion portion of the order, the SHO set forth the following four relevant definitions under Ohio Adm.Code 4123:1-5-01(B).

> (70) "Guarded": means that the object is covered, fenced, railed, enclosed, or otherwise shielded from accidental contact;
>
> (92) "Operator": any employee assigned or authorized to work on the specific equipment;

(94) "Pinch, nip, or shear point": the point or points at which it is possible to be caught between the moving parts of a machine, or between the material and the moving part or parts of a machine; and

(124) "Shall": to be construed as mandatory;

{¶ 39} The SHO found that relator was assigned or authorized to work on the conveyor in his capacity as a maintenance worker and that he, while performing weekly preventive maintenance, was exposed at a pinch point. The magistrate specifically notes that Gary Blank, the maintenance supervisor, testified that the maintenance mechanics do not operate the bale conveyor when it is "in normal operation," but that, once the bale conveyor was empty "it would be turned over to whoever the mechanics were at that time" and the bale conveyor was set to "maintenance mode" meaning "they operate it from outside of the shack." (Tr. 70.)

{¶ 40} According to Blank's testimony, there was the normal operation of the bale conveyor and there was also a time when it was operated under maintenance mode. When the bale conveyor was operated under maintenance mode, it was the mechanics who had control of the conveyor and, if necessary, would utilize the emergency stop buttons to "shut the equipment down if something happens." (Tr. 79.)

{¶ 41} After reviewing the testimony and the photographs of the bale conveyor, it is apparent that pinch points were guarded during the normal operation of the conveyor. However, in order to perform preventative maintenance on the bale conveyor, maintenance mechanics needed to (1) lock-out the bale conveyor, (2) remove the guard, and (3) perform maintenance including removing wires which can cause the machine to break. According to Blank's testimony, it was only during preventive maintenance that anyone was exposed to these pinch points. The emergency stop button was intended to shut down the equipment after someone came in contact with the pinch points and not to prevent contact since a worker could still stick their hand in it. Here, Ruckman testified that he and Horvath had nearly finished removing the wires and Horvath went to get the oil necessary before the bale conveyor resumed normal operations. At that time, there were two wires remaining. Ruckman testified that one of the wires was caught under the gear and he was unable to pull it loose. He removed the

lock-out, activated the bale conveyor, and reached in with his pliers to remove the wire. It was at this time that the wire "flipped" and his glove became caught in the gears.  (Tr. 26.)  Although, Blank testified that this was not the proper way to remove a wire, Ruckman testified that this happened 10 to 12 times a year, that ordinarily one employee would pull the wire while the other employee stood by the emergency stop button and the maintenance mechanics had requested that the emergency stop button be moved closer to the area where they worked.  Since relator never acknowledged that mechanics removed wires in this manner, there was no testimony to indicate that Ruckman violated any safety rules when he turned on the bale conveyor and attempted to remove the wires while Horvath was getting oil.  Further, as Blank testified, the emergency stop was intended to be used after an employee came in contact with the pinch point. Ruckman came in contact with the pinch point, but the emergency stop button was too far away for him to reach.

{¶ 42} There is conflicting evidence in the record and it is apparent the SHO found the testimony indicating that maintenance mechanics did operate the bale conveyor when the bale conveyor was in "maintenance mode" to be persuasive.  In *State ex rel. Internatl. Truck & Engine Corp. v. Indus. Comm.*, 122 Ohio St.3d 428, 2009-Ohio-3502, the Supreme Court of Ohio stated that, while the specific safety requirements must be strictly construed against applicability to the employer:

> [T]he rule of strict construction is one of "statutory, not evidentiary, interpretation, devised only as a guide to interpreting the specific requirements of a safety standard in VSSR claims," [*State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.*, 98 Ohio St.3d 134, 2002-Ohio-7089, at 70.] It "permits neither the commission nor a reviewing court to construe the *evidence* of a VSSR strictly in the employer's favor. " (Emphasis sic.) *Id.*  Consequently, the rule does not apply in resolving factual disputes. *Id.*

*Id.* at 430.

{¶ 43} The magistrate finds that there is some evidence in the record from which the SHO could conclude that Ruckman was an operator at the time he was injured. Once that finding is made, it is easier to see how the SHO concluded that relator had violated these three specific safety requirements.  Ohio Adm.Code 4123:1-5-05(C)(2),

conveyors exposed to contact, states: "All conveyors, where exposed to contact, shall be equipped with means to disengage them from their power supply at such points of contact."

{¶ 44} All the testimony in the stipulation of evidence acknowledges that, when the guard is removed, pinch points are exposed. As a maintenance mechanic, Ruckman performed routine preventative maintenance every Monday. Ruckman was tasked with removing bailing wire from the shafts and gears of the bale conveyor. Ruckman testified that, once his hand was caught in the bale conveyor, he was not able to reach the emergency stop button. No contradictory evidence was provided.

{¶ 45} Ohio Adm.Code 4123:1-5-05(C)(4), pinch (nip) points, states:

> Pinch points created by travel of conveyor belts over and
> around end, drive and snubber, or take-up pulleys of chain
> conveyors running over sprocket wheels shall be guarded or
> a means shall be provided at the pinch point to disengage the
> belt or chain from the power source.

{¶ 46} Finding that the commission did not abuse its discretion when it determined that Ruckman was an "operator," all of the evidence demonstrates that he was exposed to pinch points when he performed preventative maintenance. Because he had to remove the guard and had to expose himself to these pinch points, the safety requirements provide that a means to disengage the power must be provided. The evidence is clear that Ruckman was not able to reach the emergency stop button.

{¶ 47} Lastly, Ohio Adm.Code 4123:1-5-05(D)(1), disengaging from power supply, states:

> Means shall be provided at each machine, within easy reach
> of the operator, for disengaging it from its power supply.
> This shall not apply to rolling departments of iron and steel
> mills nor to electrical power generation or conversion
> equipment.

{¶ 48} Ruckman was an operator and the means to disengage the bale conveyor from its power supply was not within easy reach.

{¶ 49} Because the magistrate finds that it was not an abuse of discretion for the commission to determine that Ruckman was an operator of the bale conveyor, it likewise was not an abuse of discretion for the commission to find that relator violated

the specific safety requirements.  As such, relator's argument that it was Ruckman's unilateral negligence that was the proximate cause of his injury fails.  As a maintenance mechanic, Ruckman was tasked with removing the wires from the bale conveyor so that they did not get jammed in the gears.  Although Blank testified that he had never seen anyone clear the wires in the manner Ruckman attempted, Ruckman testified that approximately 10 to 12 times a year, a wire was stuck under the gear as happened here. Ruckman further testified that, when he attempted to remove this piece of wire, it flipped and it was at that time that his glove became tangled in the gears.  Except for the fact that Ruckman testified that ordinarily, the other maintenance mechanic would have been stationed at the emergency stop when a maintenance mechanic reached in to pull out a piece of wire while the bale conveyor was moving, relator failed to present any evidence that this action should absolve it from complying with the safety requirements. Relator did not present any evidence that Ruckman violated company procedure when he proceeded to attempt to remove this wire by himself and without a fellow maintenance mechanic stationed by the emergency stop button.  In the absence of that evidence, the magistrate finds that it was not an abuse of discretion for the commission to not find that it was Ruckman's unilateral negligence that was the proximate cause of his injuries.  As such, this argument of relator is rejected.

{¶ 50} Relator asserts that this court must apply the holding from *State ex rel. Ford v. Indus. Comm.,* 67 Ohio St.3d 121 (1993), and find that no violations occurred because the location where Ruckman was injured is accessible only during the cessation of operations and just because it started running, it was not in the course of operation.

{¶ 51} The magistrate finds that the *Ford* decision does not require this court to find that the commission abused its discretion here.  In *Ford,* the Supreme Court of Ohio found that Ohio Admin.Code 4121:1-5-05(C)(2) was inapplicable.  Larry T. Ford was a repairman assigned to inspect and repair a conveyor.  In order to see which buckets were damaged, it was necessary to remove a hinged cover and watch the buckets pass while his co-worker operated the conveyor.  When Ford saw a broken bucket, he yelled to his co-worker to stop the conveyor.  After he stopped the conveyor, the co-worker went to lock it out.  Before he locked out the conveyor, Ford climbed inside to

begin working.  Despite his co-worker's warnings that the conveyor was not locked out, Ford ignored him.  The conveyor started and Ford was killed.

{¶ 52} In finding that the code provisions did not apply, the court stated:

Ohio Adm.Code 4121:1-5-05(C)(2) mandates a disengagement device at points "exposed to contact." An object is "exposed to contact" when its location, "during the course of operation, is accessible to an employee in performance of his regular or assigned duty." Ohio Adm.Code 4121:1-5-01(B)(11). 4121:1-5-05(C)(2), therefore, will not apply if the accident occurred in a spot that was not accessible during the course of operation.

Because neither "accessible" nor "course of operation" is defined in the Revised or Administrative Code, the interpretation of these terms is within the commission's final jurisdiction. *State ex rel. Berry v. Indus. Comm.* (1983), 4 Ohio St.3d 193, 4 OBR 513, 448 N.E.2d 134. In this case, decedent was killed inside an enclosed conveyor. If the conveyor and its attached drag buckets had been moving at the time, decedent could not have entered the enclosure. Only if the conveyor was first stopped could decedent have gained access to the area in which he died. Given the commission's duty to strictly construe specific safety requirements in the employer's favor (*State ex rel. Burton v. Indus. Comm.* [1989], 46 Ohio St.3d 170, 172, 545 N.E.2d 1216, 1219), the commission did not abuse its discretion in finding that a location which is accessible only during cessation of operation was not "accessible" in the "course of operation," and was not made so merely because the conveyor subsequently started running. The commission did not err in refusing to construe the disputed safety requirement in its most literal, and liberal sense -- i.e., the conveyor was "accessible" because decedent was there and in the "course of operation" because it was on.

*Id.* at ¶ 122-23.

{¶ 53} Relator argues that the conveyor was not in the course of operation when Ruckman's injury occurred.  Asserting that the conveyor had to be shut down in order for Ruckman to perform the preventative maintenance, it mattered not that the conveyor subsequently started.

{¶ 54} The magistrate disagrees.  Relator's argument completely ignores the fact that the commission determined that (1) Ruckman was an operator, (2) there was normal operation and maintenance mode, (3) during maintenance mode, Ruckman and Horvath were the only people who had control of the conveyor, (4) because the guard had to be removed and workers then became exposed to the pinch points when preventive maintenance was performed, relator was required to provide a means at the pinch point to disengage the conveyor from the power source.

{¶ 55} VSSR cases are very fact driven.  In *Ford,* all the evidence indicated that the machine had to be shut down before Ford began repairs.  Here, Ruckman testified that 10 to 12 times a year wires became tangled as they did on the day of his injury and that he had engaged the conveyor previously to help pull out a wire.

{¶ 56} Lastly, relator argues that the commission's 40 percent penalty is excessive.  The determination of the amount to award in a VSSR is within the discretion of the commission.  Specifically, in *State ex rel. St. Marys Foundry Co. v. Indus. Comm.*, 78 Ohio St.3d 521 (1997), the Supreme Court of Ohio recognized the discretion of the commission in setting the amount of a VSSR, stating:

> [T]he commission's discretion in assessing VSSR amounts is limited only by this constitutional standard and that the commission commits an abuse of discretion, correctable in mandamus, only by assessing an award outside this range.

*Id.* at 524.

{¶ 57} Ruckman lost his hand as a result of relator's violation of three safety requirements.  Finding that the VSSR award falls within the constitutional parameters, the magistrate finds that relator has not demonstrated that the commission had abused its discretion.

{¶ 58} Based on the foregoing, it is this magistrate's decision that relator has not demonstrated  that the commission abused its discretion in finding violations of specific safety requirements and granting Ruckman a 40 percent award, and this court should deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
STEPHANIE BISCA

## NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).